UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CLAIRE DOWNEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 10-12055-DPW |
| v. | ) | |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER
March 8, 2012

Claire Downey challenges Aetna Life Insurance Company's ("Aetna") denial of her claim for short-term disability benefits under the Bank of America Corporation Short-Term Disability Plan, an ERISA employee benefit plan. The parties have filed cross-motions for summary judgment. For the following reasons, I will grant Downey's motion for summary judgment to the extent of remanding for consideration of testing not addressed by medical evaluators or the Plan Administrator, and consequently deny Aetna's motion.

## I. BACKGROUND

### A. The Parties and the Plan

Downey is a resident of Carver, Massachusetts. During the time period relevant to this suit, she was employed as a Home Service Specialist by Bank of America Corporation.

Bank of America has a short-term disability benefit plan (the "Plan") that it offers to its employees. That benefit plan, the subject of this suit, is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq.

Bank of America contracted with Aetna to handle claims for disability benefits under the Plan. Under the contract, Bank of America and Aetna agreed that "any fees paid by Bank of America to [Aetna] shall not be contingent upon the savings obtained in the adjustment, settlement, or payment of disability benefits." They further agreed that under the contract Aetna "is acting solely as third party claim administrator and shall not be designated or deemed the Plan administrator, Plan sponsor, or the employer under the Plan." The section of the Bank of America employee benefit handbook on disability benefits notes that "[t]he Bank of America Corporation Corporate Benefits Committee, as plan administrator, has delegated to the Benefits Appeals Committee and insurance companies or service providers described in this paragraph, *discretionary authority* to determine eligibility for benefits and construe the terms of the applicable plan and resolve all questions relating to claims for benefits under the plan."

Under the Plan, an employee is disabled if the following three things are shown: (1) "Due to sickness, injury or

pregnancy, you are receiving appropriate care and treatment from a licensed physician on a continuing basis," (2) "[y]ou are complying with such treatment," and (3) "[y]ou are unable to perform all the material and substantial duties of your occupation."

Once an employee submits a request for short-term disability benefits under the Plan, the employee is "required to provide medical documentation to substantiate" the claim. The short term disability administrator may request that an employee have an independent medical exam, and may have "an independent panel of board-certified specialists" review the employee's claim. The administrator "has the final authority to evaluate a claim" under the Plan, though appeals to Aetna are allowed.

B. Facts

*1. Initial Application for Short-Term Disability Benefits*

On May 27, 2009, Claire Downey was diagnosed by a neurologist with neck pain, headaches, and sleep apnea. Downey's last day of work for Bank of America was June 4, 2009. The next day, she took a leave of absence, from which she has not returned. On June 8, 2009, she filled out an authorization for Aetna to begin processing her disability claim.

On June 16, 2009, Downey submitted a Health Care Provider Certification from Dr. Eneyni diagnosing Downey with a herniated cervical disc and noting that she was complaining of neck and

lower extremity pain. Dr. Eneyni noted that he had referred Downey to a neurosurgeon for further evaluation. However, Dr. Eneyni failed to sign the Certification, and he provided no additional documentation or notations about Downey's condition.

On July 15, 2009, Aetna denied Downey's claim for short-term disability benefits. Aetna's denial letter explained that because "Dr. Eneyni failed to submit any examination findings that would support you from [sic] being unable to perform your occupation as a Home Services [sic] Specialist," it could not find Downey eligible for short-term disability benefits under the Plan. However, Aetna noted that it would take under consideration "any additional information" Downey submitted. It suggested a number of things that would be helpful in evaluating Downey's claim, such as a detailed report of Downey's specific physical limitations relating to her disability, her "treating medical provider's prognosis, including current course of treatment, frequency or visits, and specific medications prescribed," and copies of diagnostic studies such as x-rays and laboratory reports.

*2. Downey's First Supplemental Submission*

In response, on July 17, 2009, Downey submitted additional documentation from the Angels Neurological Center, consisting primarily of Dr. Eneyni's notes from three of Downey's visits, on May 27, 2009, June 18, 2009, and July 17, 2009.

i. May 27, 2009 Notes

Dr. Eneyni's notes from the May 27, 2009 visit documented that Downey's chief complaint was neck pain. Downey reported that she felt a sharp, severe pain in her neck one day when she was driving her truck in reverse and turned her head to the left. Since then, Downey reported experiencing occasional shooting pains in her arms from her neck down to her elbow, but did not have weakness, numbness, or tingling in her arms. Dr. Eneyni noted that Downey had a limited range of motion in her neck due to the pain.

Dr. Eneyni's notes also detailed Downey's recent history of neck and back problems, including that she had brain and cervical-spine MRIs in March of 2009. Those MRIs revealed degeneration of the C5-6 and C6-7 vertebrae with mild narrowing of the central canal, but severe bilateral narrowing of the C6-7 vertebrae's spinal foramen, the hole through which the spinal nerve passes as it exits the spine. Blakiston's Gould Medical Dictionary 523 (4th ed. 1979). They also revealed that Downey's C5-6 and C6-7 discs were protruding and flattening her spinal cord. Dr. Eneyni also performed motor and reflex exams on Downey. Downey had tenderness in her left trapezius muscle, a very slight decrease in her left handgrip strength as compared to her right, and increased reflex sensitivity between her triceps.

Dr. Eneyni diagnosed Downey with a herniated cervical disk and referred her to Dr. Chin for a further evaluation.

ii. June 28, 2009 Notes

Dr. Eneyni's notes from Downey's visit on June 28 contain many of the same remarks as his notes from her May 27 visit. During this visit, though Downey continued to complain of neck and back pain, Dr. Eneyni's motor exam revealed that Downey had normal strength and deep tendon reflexes in her upper and lower extremities. Downey reported that she was seeing Dr. Chin, and may need surgery for her herniated cervical disc.

iii. July 17, 2009 Notes

Dr. Eneyni's notes from Downey's visit on July 17, 2009 are similar to his notes from her previous visits. Dr. Eneyni ordered an MRI of Downey's spine and updated Downey's medication list. He also noted that Downey had seen a neurosurgeon who recommended that she continue physical therapy, because "[s]he is benifiting [sic] from it."

iv. Aetna's Response

After reviewing Downey's first supplemental submission, on July 24, 2009, Aetna upheld its initial denial of short-term disability benefits under the Plan. Aetna noted that Downey failed to provide it with notes from the physical therapy she was receiving or a copy of the MRI that Dr. Eneyni had ordered, and Dr. Eneyi's notes showed that Downey's condition was improving

with the physical therapy. Furthermore, the documentation Downey had provided failed to show that she would be unable to perform her job functions as a Home Service Specialist, which was a sedentary job. Finally, Aetna's letter to Downey instructed her that to perfect her claim, her medical providers "would need to submit range of motion measurements in numerical degrees, physical therapy notes, MRI results" and any other documents Downey thought would be helpful.

*3. Downey's Second Supplemental Submission*

On August 7, 2009, Downey delivered a second supplemental submission to Aetna in support of her claim. She included additional medical records, including a March 25, 2009 MRI; a July 23, 2009 MRI; and notes from Downey's physical therapy sessions on July 1, 2, 9, 14, 21, 30, and August 4, 2009.

i. MRIs

Downey's March 25, 2009 MRI confirmed many of the things in Dr. Eneyni's initial notes, including mild central stenosis and flattening of the spinal cord at the C5-6 and C6-7 vertebrae, and severe bilateral foraminal narrowing at C6-7. Her July 23, 2009 MRI of her lumbar region showed a left lateral disc protrusion at L3-4 contacting the left L3 ganglion without swelling.

ii. Physical Therapy Notes

The physical therapy notes from July 1, 2009 disclose under the "cervical mobility" section that Downey had 75% of motion

both bending to the side and rotating. The July 14, 2009 notes quote Downey as saying that her lower back "is what is really bothering [her]." The notes report Downey's physical therapy regimen, but by August 4, 2009, suggest that her cervical rotation and side bend motion had been reduced to 50%. The physical therapist characterized Downey's improvement as "minimal."

*4. Downey's Third Supplemental Submission*

On August 12, 2009, Aetna sent Downey a letter confirming that it had received Downey's appeal on August 7, 2009, and was taking it under review. On September 15, 2009, Downey requested that she be provided an opportunity to submit additional documentation in support of her appeal. Aetna granted Downey until September 29, 2009 to file her third supplemental submission for consideration.

On September 17, 2009, Downey submitted additional materials to Aetna, including a physical therapy referral for aquatic therapy; a report from Dr. Feoktistov, a rheumatologist; results from a blood test; a polysomnography report (a sleep-study test); and notes from an August 28, 2009 visit with Dr. Eneyni.

The rheumatologist's report discusses Downey's history with sleeping, leg, and joint problems. Although Downey complained of joint pain, stiffness, sleep apnea, restless leg syndrome, and other aches, the rheumatologist noted that in general, Downey "is

well-appearing and in no acute distress." She appeared to be comfortable while seated, and evidenced no "pain on palpation or limitation in range of motion of the hands, wrists, elbows, or shoulders." Downey exhibited "mild discomfort on palpation of the upper extremity muscles" and muscular pain in her foot when the doctor squeezed it. The rheumatologist hypothesized that Downey might have myalgias as a result of her lack of restorative sleep, and ordered a blood test.

Blood tests did not show anything abnormal other than slight variations in her levels of vitamin D and another compound. The sleep study showed that during the course of the night, Downey experienced four REM/Non-REM sleep cycles, and scored a 91.76% on the Sleep efficiency score using a sleep-apnea mask (called a continuous positive airway pressure mask, or CPAP for short). The study did not report her quality of sleep without the mask.

During Downey's August 28, 2009 visit to Dr. Eneyni, she complained of being in pain even while taking oxycodone. Dr. Eneyni noted that Downey was "having significant problems sitting at a desk trying t [sic] work." Dr. Eneyni noted that he was waiting to see whether Downey's condition improved with better sleep after she was fitted with a new CPAP mask after the sleep study.

*5. Aetna Obtains Independent Reports*

On September 24, 2009, Aetna requested that independent doctors specializing in rheumatology, occupational medicine, and pulmonology, review Downey's claim file.

i. Pulmonologist's Report

On September 29, 2009, Dr. Klotz, a pulmonary disease specialist, filed his report with Aetna. After reviewing the claim file, within the area of pulmonology, Dr. Klotz found that "the evidence does not support any functional impairment" during the relevant time frame. While Downey had a history of obstructive sleep apnea, no records were provided about its effect on her. "She did have a sleep study, but this was performed on CPAP and it was essentially normal." More importantly, the claim file did not include any evidence of cognitive impairment, memory problems, or excessive sleepiness that would signal that Downey's claim was related to her sleep apnea. An Epworth Sleepiness Scale had not been filled out, and Downey's letter of appeal "did not include any problems related to sleep apnea and was primarily related to pain in her back." Thus, with respect to pulmonology, Dr. Klotz found that Downey's claim file lacked sufficient evidence that she was unable to perform the duties of her job as a Home Service Specialist.

ii. Occupational Medicine Report

On October 6, 2009, Dr. Sethi, a specialist in Occupational Medicine, filed his report. Dr. Sethi noted that the Home Service Specialist job was sedentary according to the job description provided. Next, Dr. Sethi reviewed all of the claim file and determined that Downey did not have any evidence to support a finding that she could not perform the requirements of her sedentary job. Although Downey had "multiple ongoing self-reported pain complaints," they were "without any objective clinical examination findings/imaging study findings supporting impairment from an occupational medicine standpoint." Dr. Sethi reported that he had reviewed the notes from Downey's physical therapy sessions, he did not specifically mention them in his summary of his clinical file review.

iii. Rheumatologist's Report

On October 13, 2009, Dr. Lumpkins, a rheumatologist, submitted her report. After reviewing the claim file, Dr. Lumpkins felt that Downey's "fibromyalgia and sleep apnea do not restrict [her] from physical function at a sedentary level" though she recommended that Downey "avoid working at unprotected heights, driving a company vehicle, working with heavy machinery or safety sensitive materials to avoid a safety risk" to Downey or others. From a rheumatological standpoint, Dr. Lumpkins felt that Downey was not impaired such that she could not perform the

sedentary job functions of the Home Service Specialist. She thought that although Downey had a herniated cervical disk, Downey was "not noted to have any deficits neurologically and the records do not indicate she is restricted significantly range of motion wise either in the lumbar or cervical region." Similarly, Downey's fibromyalgia was not shown to be sufficiently debilitating such that Downey could not perform her sedentary job functions. As with Dr. Sethi's report, though Dr. Lumpkins reviewed the notes from Downey's physical therapy sessions, she did not specifically mention them in her summary of her clinical file review.

*6. Further Supplements to the Record*

On October 16, 2009, Aetna notified Downey that Drs. Sethi and Lumpkins had each attempted to contact Dr. Eneyni to talk to him before filing their reports, but he never returned their calls. Thus, Drs. Sethi and Lumpkins submitted their reports to Dr. Eneyni for comment before finalizing them.

On October 28, 2009, Downey submitted additional information to Aetna in support of her appeal. First, she included notes from a September 28, 2009 visit to her physical therapy center. Those notes included an assessment that Downey's trunk range of motion was between 25% and 50%, and her strength was between 3 and 4 out of 5. She had a "slow, deliberate" gait, and her pain was aggravated by prolonged sitting or standing. Downey also

included her aquatic physical therapy records from October 13, 20, and 22, 2009.

*7. Aetna Obtains Additional Independent Report*

On October 28, 2009, Aetna requested that an independent neurologist, Dr. Cohan, consider Downey's claim file and submit a report, which he did on October 30, 2009. After reviewing the entire claim file, the new submissions from Downey, and the three prior independent reports from Drs. Klotz, Sethi, and Lumpkins, Dr. Cohan opined that Downey was not disabled. Dr. Cohan agreed with the prior three independent reports that "the documentation provided is not indicative of a functional impairment for the claimant's own sedentary occupation." He stated:

> The claimant has a history of obstructive sleep apnea syndrome, but a recent polysomnogram while on CPAP therapy was not indicative of a significant impairment for work. The medical records do not describe excessive daytime sleepiness such that the claimant would be unable to perform her own sedentary occupation. She has a history of migraine headaches, but there is no indication in any of the medical records that the claimant's headaches are of such frequency and/or severity as to preclude work. There is no indication that the claimant's headaches are associated with intractable nausea or vomiting, dehydration, electrolyte disturbance, or frequent emergency visits for analgesic treatment. The claimant carries a diagnosis of fibromyalgia syndrome, but none of the medical records document the presence of fibromyalgia tenderpoints. Additionally, it is well-described in literature that performance of nonphyscially demanding activities such as sedentary work is not contraindicated in fibromyalgia and is, in fact, therapeutic. The claimant has evidence of cervical and lumbar diskogenic disease, but the neurologic exam findings are not indicative of radiculopathy, and electrodiagnostic testing has not

> been performed. The presence of neck and low back discomfort does not in itself preclude work.

*8. Downey's Final Supplement to the Record*

On November 7, 2009, Downey underwent a nerve conduction study. The report concluded that, "[a]part from the reduced left peroneal motor response amplitude, there is no evidence for a lumbar radiculopathy affecting either lower extremity." Downey submitted that report to Aetna for consideration and it was apparently received, based on the chronological sequencing of the administrative record, sometime before November 16, 2009.

*9. Independent Physicians Update their Reports*

In light of some[1] of the additional information provided by Downey to Aetna, Drs. Klotz, Sethi, Lumpkins), and Cohan, updated their reports.

i. Dr. Klotz

Dr. Klotz's opinion did not change based on the additional evidence provided by Downey which he reviewed. Dr. Klotz continued to find no any pulmonary-related reason why she could not perform the sedentary functions of her job.

---

[1] They apparently did not have---and consequently did not address---Downey's EMG and nerve conduction study in their case files when they revised their reports. The failure to address forms the basis for my remand to the Plan Administrator, as discussed in Section III.B. below.

ii. Dr. Sethi

Dr. Sethi's opinion did not change based on the additional evidence provided by Downey which he reviewed. He noted that while the new reports indicated that Downey was complaining of pain, no objective physical findings were provided to support Downey's claim that her ability to perform her job is impaired as a result of her subjective symptoms. Dr. Sethi then reviewed Downey's physical therapy notes in which she was reported to have only between 25% and 50% of her side bending and trunk rotation. He did not think that the physical therapy notes' findings were significant enough "to preclude the claimant from performing her own sedentary-level occupation as a Home Service Specialist."

iii. Dr. Lumpkins

Dr. Lumpkins updated her opinion twice, once on November 19, 2009 and again on December 17, 2009.

In her November 19 update,[2] Dr. Lumpkins reviewed Dr. Eneyni's notes from Downey's October 23, 2009 visit. In those notes, Dr. Eneyni reported that Downey was having a hard time sitting at a desk for extended periods of time. Dr. Lumpkins's opinion did not change as a result of Dr. Eneyni's notes, the FMLA report included in Downey's updated file, or the reports of

---

[2] This update was only belatedly added to the administrative record after motions for summary judgment had been submitted. The update both prefigures the significance of the EMG and nerve conduction study and evidences the fact that the results were not provided to the independent physicians. *See* n.1, *supra*.

Drs. Klotz and Sethi. Dr. Lumpkins found that, from a rheumatology perspective, Downey was not impaired, but that her use of pain medications restricted her from working at unprotected heights, driving a company vehicle, working with heavy machinery, or lifting and carrying weights heavier than 20 pounds occasionally and 10 pounds frequently. Dr. Lumpkins also thought that Downey would require the ability to change positions as needed, but ultimately concluded---as she had in her prior report---that Downey retained the residual functional capacity to perform sedentary work. Dr. Lumpkins noted that a "neurological evaluation and EMG/nerve conduction study documenting radiculopathy *could be utilized to alter the current recommendations*" (emphasis added).

In her December 17, 2009 update, Dr. Lumpkins's opinion did not change based on the additional evidence Downey provided between November and December, including Downey's physical therapy notes. In answering "what type of additional clinical documentation would be helpful for the evaluation of this claimant's proclaimed functional impairment?," Dr. Lumpkins reiterated that "[n]o further documentation is required other than, as stated in the report 11/19/09, a neurosurgical evaluation and EMG/nerve conduction study documenting radiculopathy."

As Downey notes, she had already had an EMG/nerve conduction study performed by the time Dr. Lumpkins filed her two reports. However, Dr. Lumpkins was apparently not provided with that study.

iv. Dr. Cohan

Like the other independent doctors, Dr. Cohan's opinion did not change based on the additional evidence provided by Downey which he received. After reviewing the physical therapy notes, Dr. Cohan noted that none of the documents in the claim file give "a comprehensive description of the claimant's neurologic and musculoskeletal exam findings. The documentation does not describe anatomic localization of fibromyalgia tender points. The documentation does not provide any new objective information which has not been previously considered." Dr. Cohan did note that the file suggested that Downey "would likely be restricted to performing sedentary and/or light work," but nothing had been provided to show that Downey could not perform her sedentary job functions.

*10. Aetna Upholds Prior Denial of Short-Term Disability*

On December 16, 2009, Aetna upheld its prior denial of Downey's short-term disability claim. It sent a letter to Downey summarizing all of the reports it had received in support of her claim. That letter explained that Aetna's denial of Downey's claim was based on a lack of clinical findings and medical

evidence showing that she was unable to perform the functions of her sedentary job.

C. Proceedings

Downey filed this action on November 29, 2010 under section 520 of ERISA, alleging that Aetna's denial of Downey's claim was arbitrary and capricious and unlawful, and requesting that this court grant her claim for short-term disability benefits.

## II. STANDARD OF REVIEW

In an ordinary civil case, summary judgment is a procedural device to weed out claims with only legal issues or where the facts are not in dispute. In the ERISA context, however, "trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not [usually] take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002). That is, "where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). The usual factual inference in

favor of the non-moving party does not apply in the ERISA summary judgment context. *Id.* at n.9.[3]

A. What Deference is Owed?

The Supreme Court determined in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989) that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If, however, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright*, 402 F.3d at 74 (internal citation and quotation omitted). What this deference means is that the plan administrator's interpretation "will not be disturbed if reasonable." *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (citation and quotation omitted).

---

[3] The First Circuit has not consistently articulated this last point. In a 2005 ERISA case, the First Circuit held that the operative inquiry under the deferential standard of review is "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) (emphasis added) (citing *Twomey v. Delta Airlines Pension Plan*, 328 F.3d 27, 31 (1st Cir. 2003), which in turn cites *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2000)).

Here, Bank of America contracted with Aetna that Aetna would administer Bank of America's Plan for a fee. Under the contract, Aetna was "third party claim administrator and shall not be designated or deemed the Plan administrator, Plan sponsor, or the employer under the Plan." Under Schedule A of the Administrative Services Agreement, Bank of America agreed that Aetna "will be the 'appropriate named fiduciary' of the Plan for purpose of reviewing denied claims under the Plan. In exercising such fiduciary responsibility, [Aetna] will have *discretionary authority to determine entitlement to Plan benefits* as determined by the Plan Documents for each claim received and to construe the terms of the Plan." This is sufficient for this court to invoke ERISA's arbitrary and capricious standard of review.

Furthermore, the section of the Bank of America employee benefit handbook on disability benefits notes that "[t]he Bank of America Corporation Corporate Benefits Committee, as plan administrator, has delegated to the Benefits Appeals Committee and insurance companies or service providers described in this paragraph, *discretionary authority* to determine eligibility for benefits and construe the terms of the applicable plan and resolve all questions relating to claims for benefits under the plan." This language in the handbook is additional evidence that Aetna has the discretion which triggers arbitrary and capricious review. *See, e.g.*, *Diaz v. Metro. Life Ins. Co.*, 688 F. Supp. 2d

49, 59 (D.P.R. 2010) (applying arbitrary and capricious review where an employer's summary plan description said that the insurance company had "discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits").

Thus, Aetna's decision will not be disturbed as long as it is reasonable. *Conkright*, 130 S. Ct. at 1651.

B. Is there a Cognizable Conflict of Interest?

Downey claims that Aetna's stipulation in this litigation that it "will be liable for the payment of any judgment entered in this action concerning the payment of disability insurance benefits to the plaintiff," creates a conflict of interest that must be taken into account in determining how much deference to give Aetna's claim determination. Under Supreme Court precedent, where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).

But the stipulation was not in place until February 28, 2011. In 2009 when Aetna reviewed, and ultimately denied, Downey's claim, the roles of Bank of America and Aetna were fully separated. When Aetna reviewed the claim, it was not "both determin[ing] whether an employee is eligible for benefits and pay[ing] benefits out of its own pocket" because, as of 2009, Bank of America funded the Plan, and Aetna only administered it.

Thus, as Downey's counsel conceded at the hearing in this matter, no conflict of interest existed during the relevant time period. Of course, even if one did exist, it would not change the standard of review from arbitrary and capricious review to de novo review. *Glenn*, 554 U.S. at 115. It would simply be a "factor" for the court to consider.

## III. DISCUSSION

Downey claims Aetna made numerous errors in evaluating her claims, and therefore that the denial of disability benefits should be reversed or remanded for further consideration. She claims that (1) Aetna's denial was unreasonable because it wrongly discounted objective evidence supporting Downey's claim; (2) Aetna failed to consider the November 2009 EMG and nerve conduction study; and (3) Aetna denied Downey's claim under an incorrect definition of "disability" under the Plan.

A. Substantial Evidence Can be Found to Support Aetna's Decision, but Additional Evidence Must be Considered

With the caveat discussed in Part B below, requiring a limited remand to the Plan Administrator for further consideration, I am of the view that Aetna's decision to deny Downey's claim for short-term disability benefits was reasonable and supported by substantial evidence in the record and considered by the independent physicians.

Downey was diagnosed with four ailments that could lead to a finding of disability: sleep apnea, migraine headaches, fibromyalgia, and a herniated cervical disk. However, she failed to provide objective evidence showing how any of them prevented her from performing her duties as a Home Service Specialist.

First, Downey did not complain of excessive tiredness, inability to concentrate, or other possible symptoms related to her sleep apnea. Dr. Klotz confirmed that the claim file showed no objective evidence that Downey's sleep apnea would prevent her from doing her job. Downey had also undergone a sleep study, and when wearing a CPAP mask her sleep was, as Dr. Klotz noted, essentially normal. Aetna's denial letter reasoned that the evidence before it showed that "[t]here is no evidence of cognitive impairment or memory problems. There is no indication of excessive daytime sleepiness which would be expected to interfere with your functionality." Given the record, it was

therefore reasonable for Aetna to conclude that Downey’s job functions were not impaired by her sleep apnea.

Second, Downey did not claim that her migraine headaches prevented her from completing the requirements of her sedentary job. Therefore it was reasonable for Aetna to conclude that her job functions were not impaired by a condition she did not complain about.

Third, substantial evidence supported Aetna’s decision that Downey was not disabled due to her fibromyalgia. Dr. Lumpkins opined that, given the record, Downey did not exhibit fibromyalgia “of sufficient severity to preclude the claimant from the physical function required to perform sedentary full time work.”

Downey’s rheumatologist’s report failed to provide any objective findings supporting her claim. Although Downey complained of joint pain, stiffness, sleep apnea, restless leg syndrome, and other aches, the rheumatologist noted that in general, Downey “is well-appearing and in no acute distress.” She appeared to be comfortable while seated, and evidenced no “pain on palpation or limitation in range of motion of the hands, wrists, elbows, or shoulders.” Downey exhibited “mild discomfort on palpation of the upper extremity muscles” and muscular pain in her foot when the doctor squeezed it, but the rheumatologist did not suggest that she would be unable to work a sedentary job as a

result. The rheumatologist hypothesized that Downey might have myalgias as a result of her lack of restorative sleep, and ordered a blood test, which came back essentially normal.

Thus, nearly all of the objective factors suggested that Downey's fibromyalgia was, as Dr. Lumpkins opined, insufficiently severe to prevent her from performing her sedentary job functions. On the record addressed by the independent physicians, this was a reasonable conclusion.

Fourth, Downey failed to produce evidence why her back problems prevented her from performing her job functions. The strongest evidence she provided to Aetna of her limitations were her physical therapists' notes detailing that her side-bending and torso rotation were limited to between 25% and 50%, and that her strength in some of her extremities was a 3 or 4 on a scale of 5. What Downey failed to do, however, was show how any of that prevented her from performing her job as a sedentary Home Service Specialist.

The Aetna reviewers adopted what they viewed as the closest analogue to Downey's job as a Home Service Specialist in the United State Department of Labor Dictionary of Occupational Titles, that of Mortgage Loan Processor, occupational code 249.362-022, for comparison. That job description is as follows:

> Verifies, compiles, and types application information for mortgage loans: Reviews residential loan application file to verify that application data is complete and meets establishment standards, including

> type and amount of mortgage, borrower assets, liabilities, and length of employment. Recommends that loan not meeting standards be denied. Calls or writes credit bureau and employer to verify accuracy of information. Types loan application forms, using computer. Calls specified companies to obtain property abstract, survey, and appraisal. Informs supervisor of discrepancies in title or survey. Submits mortgage loan application file for underwriting approval. Types and mails approval and denial letters to applicants. Submits approved mortgage loan file to MORTGAGE LOAN CLOSER (financial) 249.362-018 for settlement. Records data on status of loans, including number of new applications and loans approved, canceled, or denied, using computer.

*See* U.S. Dep't of Labor Dictionary of Occupational Titles (4th ed. 1991), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02C.HTM.

That job description is classified as being "sedentary." A "sedentary" job under the regulations is defined as follows:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking of standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

*Id.* at App'x C: Components of the Definition Trailer, IV. Physical Demands - Strength Rating (Strength), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Downey has not shown how her limited ability to bend to the side or twist her torso makes her unable to perform the above

related tasks as described by the DOT. Downey never provided her own job description, or objected to the use of the DOT description by Aetna's reviewers. No other range of motion limitations were described by any physicians; indeed, except for her physical therapist, the professionals Downey saw described her motor skills, range of motion, strength, and other abilities as relatively normal or unimpaired.

The independent physicians who reviewed Downey's claim file found that it lacked sufficient objective evidence to show that she was disabled and unable to perform the functions of her sedentary job.

However, Dr. Lumpkins did indicate in her November 2009 report that a "neurological evaluation and EMG/nerve conduction study documenting radiculopathy could be utilized to alter the current recommendations." And in her December report, Dr. Lumpkins reiterated that "[n]o further documentation is required other than, as stated in the report 11/19/09, a neurosurgical evaluation and EMG/nerve conduction study documenting radiculopathy." By that time, Downey had already completed an EMG/nerve conduction study, which showed that Downey had "reduced left peroneal motor response amplitude," though it found "no evidence for a lumbar radiculopathy affecting either lower extremity."

I cannot say, on this record where no physicians have had an opportunity to review the EMG/nerve conduction study, that Aetna's failure to provide it to Dr. Lumpkins or the other physicians was harmless. Thus, as discussed below, I will remand the case to the Plan Administrator for consideration of the full record including Downey's EMG/nerve conduction study and any updates Aetna's physicians make to their reports after being provided an opportunity to review the study.

B. Downey was Denied a "Full and Fair" Review

Downey alleges that she was denied a full and fair review under the ERISA regulations because Aetna denied her appeal without reviewing the EMG and nerve conduction study she had on November 7, 2009. Aetna listed the sources it considered in its denial letter to Downey, and the EMG and nerve conduction study was not listed.[4] Nor, as noted above, were the physicians that

---

[4] Oddly, Downey repeatedly suggested in her briefing on summary judgment that Dr. Lumpkins reviewed the EMG and nerve conduction study. In support of the claim that Dr. Lumpkins reviewed the study, Downey cites a page of Dr. Lumpkins's revised report, which says in full:

> No further documentation is required *other than*, as stated in the report 11/19/09, a neurosurgical evaluation *and EMG/nerve conduction study* documenting radiculopathy. However, a functional capacity evaluation or video surveillance *may be* additionally warranted if necessary to determine the claimant's current functional status.

Contrary to Downey's contention, the report does not say Dr. Lumpkins reviewed the EMG and nerve conduction study; indeed, it suggests the opposite—that Dr. Lumpkins has not seen the study at

Aetna contracted with provided copies of the EMG/nerve conduction study, even Dr. Lumpkins who had noted that it "could be used to alter" her recommendations.

Under ERISA, an employee disability benefit plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Under the relevant regulations, a full and fair review for disability plans must provide for, among other things, "a review that takes into account *all* comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv) (emphasis added).

Aetna does not dispute that its letter does not include Downey's November 9, 2009 EMG and nerve conduction study. Nor does Aetna argue that it substantially complied with (h)(2)(iv)'s requirements.[5] Nor, indeed, does the record demonstrate that

all, since she says that no other documentation is required *other than* an EMG and nerve conduction study. At the hearing on this matter, counsel for the parties agreed that the record supports the proposition that there was no review by the independent medical experts of the EMG and nerve conduction study Downey submitted.

[5] Numerous circuits have upheld a plan administrator's decision that substantially complies with ERISA's regulations. *See, e.g.*,

Aetna considered the EMG/nerve conduction study in its final denial of Downey's claim. Thus, I will remand to Aetna to allow the independent physicians to update their reports after reviewing Downey's EMG/nerve conduction study, in order that Downey be provided with a "full and fair review" of "all" of her record. Without such a review I am not in a position to determine what effect, if any, the EMG and nerve conduction study has upon the ultimate substantial evidence calculus. It is for medical professionals in the first instance to opine concerning the significance of that study.

<u>C.</u> <u>Definition of Disability was not Prejudicial</u>

Finally, Downey argues that the definition of disability in Aetna's denial letter was different than the one in the Plan documents. Though Downey does not explain under what theory such an error would entitle her to relief, Aetna's brief in opposition proceeds under the assumption that Downey is claiming a denial of adequate notice.

---

*Nichols v. Prudential Ins. Co.*, 406 F.3d 98, 107 (2d Cir. 2005); *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 492-93 (D.C. Cir. 1998); *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 234-36 (4th Cir. 1997); *Halpin v. W.W. Grainger. Inc.*, 962 F.2d 685, 690, 693-94 (7th Cir. 1992). The First Circuit has done so in the context of ERISA's notice requirements, *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998) ("Not all procedural defects . . . will upset a fiduciary's decision. Substantial compliance with the regulations is sufficient."), but not in the context of (h)(2)(iv)'s requirement that the appellate review take into account "all comments, documents records, and other information submitted by the claimant relating to the claim."

The summary of the Plan contained in the handbook stated, in relevant part, the following about short-term disability benefits:

> Short-term disability provides income protection if you are unable to work for more than seven consecutive calendar days due to illness, injury or pregnancy disability. . . . You are considered disabled if you meet the following requirements: [(1)] Due to sickness, injury or pregnancy, you are receiving appropriate care and treatment from a licensed physician on a continuing basis[; (2)] You are complying with such treatment[; and (3)] You are unable to perform all of the material and substantial duties of your occupation.

Aetna's letter upholding its prior denial of Downey's appeal stated that:

> Disabled is defined as an inability to perform his or her essential occupation functions for more than seven consecutive calendar days because of pregnancy, illness, injury, non-elective surgery or hospitalization up to a maximum of 26 weeks from the date of his or her disability, as determined by the Short Term Disability (STD) Claims Administrator and the treating medical provider. . . . Benefits are not paid in the following circumstances: . . . If the associate fails to have a physical examination and/or provide satisfactory objective evidence of disability or continuing disability or other information requested by the Claims Administrator.

Downey claims that the exclusion of coverage if the claimant "fails to have a physical examination and/or provide satisfactory objective evidence of disability" is not in the Plan summary, and therefore Aetna's denial of Downey's claim was erroneous because Aetna used the wrong standard.

Aetna denied Downey's claim "due to a lack of medical evidence to support your inability to perform the essential

functions of your own occupation." Under the definition of disability both in the Plan ("You are unable to perform all of the material and substantial duties of your occupation") and in the letter ("Disabled is defined as an inability to perform his or her essential occupation functions"), Aetna concluded Downey was not disabled. Thus, her claim that Aetna used the wrong standard is immaterial.

Even if Downey is correct that the two different phrasings of disability are a meaningful form of notice violation under the ERISA regulations, she fails to show prejudice. Downey must "show prejudice in a relevant sense," *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 840 (1st Cir. 1997), that is, she must show that the outcome would have been different had she received proper notice. "[A]llowing a claim for relief because of inadequacy of formal notice without any showing that a precisely correct form of notice would have made a difference would result in benefit claims outcomes inconsistent with ERISA aims of providing secure funding of employee benefit plans." *Id.*

Downey cannot show prejudice, nor does she try to. The letters she was given from Aetna informed her that she should supplement the record with objective findings as to why she could not perform her current job functions, so she was adequately put on notice of the critical issue in her case. Her actions demonstrate that she understood what was required, because she

repeatedly submitted additional reports and test results to Aetna to consider. Finally, Downey has not alleged that the outcome of her claim would be any different if the portions of the definition of disability which she objects to in the final letter (which, as noted above, are irrelevant for her claim) had not been considered by Aetna. Because nothing in Aetna's final letter suggests that the objected-to portion of the requirements for showing a disability were necessary factors that were relied upon in denying her appeal, Downey cannot show prejudice.[6]

## IV. CONCLUSION

For the reasons set forth above, I (1) GRANT in part Downey's motion for summary judgment (Dkt. No. 21) to the extent that I order REMAND; and (2) DENY Aetna's motion for summary judgment (Dkt. No. 22). The case shall be REMANDED to Aetna to allow the independent physicians to update their reports after reviewing Downey's EMG/nerve conduction study, in order that Downey be provided with a "full and fair review" of "all" of her record.

***/s/ Douglas P. Woodlock***
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

[6] Downey also argues that her claim should be remanded to measure Downey's disability against the requirements of the "correct occupation." Downey has not shown that Aetna's use of a "Mortgage Loan Processor" was incorrect, therefore a remand is not warranted on this ground.